U.S. DISTRICT COURT
EASTERN DISTRICT-WI
2020 MAR 26 A 8· 54

CLERK OF COURT

JOSEPH WALKER

PLAINTIFF

20-C-0487

Case No._____

V.

CITY OF MILWAUKEE,
MILWAUKEE POLICE DEPARTMENT,
POLICE OFFICER LISA PURCELLI
POLICE OFFICER TANYA BOLL
POLICE OFFICER BALBIR MAHAY,
POLICE OFFICER JEREMY GONZALEZ
POLICE OFFICER DANIEL CLIFFORD
WITH POLICE OFFICER JOHN DOE #1 -10

DEFENDANTS

_____/

# FEDERAL COMPLAINT WITH JURY DEMAND

NOW COME the above-named Plaintiff, *pro se* and for his causes of action against the above-named Defendants, the Plaintiff alleges and shows claims for relief as follows:

INTRODUCTION

1. This is a federal civil rights action under the Fourth and Fourteenth Amendments to the Constitution of the United States and Title 42 of the United States Code, Section 1983. PLAINTIFF bring this action to obtain compensatory damages, punitive damages, attorneys' fees, costs and equitable relief for the serious personal injuries resulting of JOSEPH WALKER,

who was unlawfully subjected to excessive force when he was shot on or about April 5, 2014, by one or more of the Defendants, including TANYA BOLL. The conduct of the Defendants and the constitutional violations suffered by JOSEPH WALKER occurred as a direct result of the unconstitutional policies of the City of Milwaukee, Milwaukee Police Department and their agents.

## JURISDICTION AND VENUE

Jurisdiction

2. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution and Title 42 of the United States Code, Section 1983. Jurisdiction of the Court is conferred by Title 28 of the United States Code, Sections 1331 and 1343(a)(3) and (4).

Venue

3. The Eastern District of Wisconsin is the proper federal venue for this action, pursuant to Title 28 of the United States Code, Section 1391 (b ), because it is the judicial district where the constitutional rights violations of JOSEPH WALKER were committed.

## PARTIES

4. That Plaintiff, JOSEPH WALKER, at all times material hereto, has been a permanent resident in the City of Milwaukee, State of Wisconsin and has attained the age of majority.

**Defendants**

5. That Defendant, the City of Milwaukee ("MILWAUKEE"), at all times material hereto, was a municipal corporation, organized and existing under the laws of the State of Wisconsin, whose principal offices are located at City Hall, 200 East Wells Street, Room 205, City of Milwaukee, State of Wisconsin, 53202.

6. That Defendants POLICE OFFICER LISA PURCELLI , POLICE OFFICER TANYA BOLL, POLICE OFFICER BALBIR MAHAY, POLICE OFFICER JEREMY GONZALEZ, POLICE OFFICER DANIEL CLIFFORD, WITH POLICE OFFICER JOHN DOE #1 -10, at all times material hereto, were adult residents of the City of Milwaukee, State of Wisconsin, and were Milwaukee Police Department ("MPD") officers employed by MILWAUKEE. That, at all times material hereto, these Police Officers were acting under color of law, were carrying out their duties as MPD officers and were acting within the scope of their employment with MILWAUKEE.

7. That Milwaukee Police Department has adopted the WILEAG Policy for Law Enforcement standards regarding use of lethal force.

8. That official WILEAG Policy prevents the use of lethal force to prevent any person from committing suicide.

# FACTS

MILWAUKEE's Unconstitutional Policies

9. Since 2008, Defendant City of Milwaukee ("City" or "Milwaukee"), through the MPD, has engaged in an unlawful policy, practice, and custom of conducting a high-volume, suspicionless stop-and-frisk program. This program authorizes MPD officers to stop people without objective and articulable reasonable suspicion of criminal conduct, and to frisk people without reasonable suspicion that the person is armed and dangerous, as required under the Fourth Amendment. Under this program, the MPD also conducts pervasive stops and frisks that are motivated by race and ethnicity in violation of the Fourteenth Amendment and Title VI.

10.     The MPD's unconstitutional, suspicionless stop-and-frisk program was adopted as part of a so-called "broken windows" policing strategy purportedly devised to deter crime. The strategy includes blanketing certain geographic areas in which residents are predominantly people of color with "saturation patrols" by MPD officers, who conduct high-volume, suspicionless stops and frisks throughout the area. Over time, the MPD's program has developed into a formal and informal quota system that requires patrol officers to meet numerical targets for stops on a regular basis.

11.     As a result, the combined number of MPD traffic and pedestrian stops skyrocketed from just 66,657 in 2007 to 196,434 in 2015—a staggering, nearly threefold increase.

12.     Overwhelmingly, the victims of the MPD's suspicion-less stop-and-frisk program are Black and Latino people. Though implemented citywide, the MPD's program has been largely concentrated in neighborhoods of color, including Milwaukee Police Districts Three, Five, and Seven, all of which are located in predominantly Black neighborhoods in the northern half of the City.

13.     In addition, data reflect that Black and Latino people are more likely than white people to be stopped and frisked throughout Milwaukee, including in mixed-race and predominantly white neighborhoods. A 2011 Milwaukee Journal Sentinel analysis of MPD traffic stop data found that Black drivers citywide were seven times more likely—and that Hispanic drivers were five times more likely—to be targeted for a traffic stop than white drivers. Moreover, Black non-Hispanic people made up 72% of the targets of MPD stops conducted between 2010 and 2012 that were documented in an MPD database, even though they made up an estimated 34% of the City's total population at the time, according to U.S. Census figures.

14.     The MPD's high-volume, suspicionless stop-and-frisk program has created and deepened public fear of and alienation from the MPD, particularly among Black and Latino residents. Black and Latino people throughout Milwaukee—including children—fear that they may be stopped, frisked, or otherwise treated like criminal suspects when doing nothing more than walking to a friend's house or home from school, driving to and from the homes of loved ones, running errands, or simply taking a leisurely walk or drive through the City. No matter where they are in the City, Black and Latino people face the constant fear that they and their children may be subjected to police harassment even if they are doing nothing wrong. That there is a long, tragic history of a widespread pattern of constitutional violations committed by MPD officers.

15.     That some famous names in MILWAUKEE history, including, but not limited to, Daniel Bell, Ernest Lacy, Tandy O'Neal, Justin Fields, Curtis Harris, Frank L. Jude, Jr., Wilbert Prado and Derek Williams, were victims of constitutional rights violations committed by MPD officers.

16.     That one of the latest victims of the widespread pattern of constitutional rights violations committed by MPD officers is JOSEPH WALKER, who suffered an unlawful stop and attempted arrest which resulted in the fatal use excessive force.

17.     That the moving force behind the widespread pattern of constitutional violations committed by MPD officers, including the violations suffered by JOSEPH WALKER, are the unconstitutional policies of MILWAUKEE including: (a) the deficient hiring and retention policy; (b) the failure to train policy; ( c) the failure to discipline policy; and ( d) the custom of condoning constitutional rights violations.

18.     That the FIRE AND POLICE COMMISSION (FPC) and MPD Chief of Police are the policy-makers for MILWAUKEE with respect to the discipline of MPD officers.

19.      That MILWAUKEE has a long history of failing to discipline its police officers for misconduct, including, but not limited to, the commission of constitutional rights violations.

20.      That the policies of MILWAUKEE with respect to its failures to discipline MPD officers, as set forth in the preceding paragraphs, were the moving force behind the constitutional violations suffered by JOSEPH WALKER.

21.      That MILWAUKEE had actual and/or constructive notice that MPD officers were unlawfully detaining individuals prior to August 31, 2017.

22.      That, despite having actual and/or constructive notice that MPD officers were unlawfully detaining individuals, MILWAUKEE took no action to cease such unlawful conduct of discipline the MPD officers involved.

23.      That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unlawfully detaining individuals, MILWAUKEE allowed the unlawful detentions to continue, including the unlawful arrest suffered by JOSEPH WALKER.

24.      That MILWAUKEE had actual and/or constructive notice that MPD officers were unreasonably arresting and searching individuals prior to August 31, 2017.

25.      That, despite having actual and/or constructive notice that MPD officers were unreasonably searching individuals, MILWAUKEE took no action to discipline the MPD officers involved.

26.      That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in unreasonably arresting and searching individuals, MILWAUKEE allowed the unreasonable arrests and searches to continue, including the unreasonable arrest suffered by JOSEPH WALKER.

27.     That MILWAUKEE had actual and/or constructive notice that MPD officers were using excessive force against individuals prior to August 31, 2017.

28.     That, despite having actual and/or constructive notice that MPD officers were using excessive force against individuals, MILWAUKEE took no action to discipline the MPD officers involved.

29.     That, as a result of MILWAUKEE's failure to discipline the MPD officers involved in using excessive force against individuals, MILWAUKEE allowed the uses of excessive force to continue, including the use of excessive force suffered by JOSEPH WALKER.

30.     That THE DEFENDANTS unlawfully detained, unreasonably searched, and used excessive force against JOSEPH WALKER because, prior to August 31, 2017, other MPD officers had not been disciplined for similar misconduct.

31.     That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable searches and uses of excessive force.

32.     That, if MILWAUKEE had not failed to discipline MPD officers for unlawful detentions, unreasonable searches and uses of excessive force, the unlawful detention, unreasonable search and the use of excessive force suffered by JOSEPH WALKER would not have happened.

33.     That MILWAUKEE presently maintains a policy of failing to discipline MPD officers for engaging in misconduct, including, but not limited to, unlawful detentions, unreasonable searches and uses of excessive force.

## Custom of Condoning Constitutional Rights Violations

34.     That, prior to August 31, 2017and continuing to the present, MILWAUKEE maintained/maintains a custom of condoning constitutional rights violations by MPD officers.

35.     That this custom of condoning constitutional rights violations by MPD officers was/is so persistent and widespread that it was/is the official policy of MILWAUKEE.

36.     That, prior to August 31, 2017, MILWAUKEE had actual and/or constructive notice of the custom of condoning constitutional rights violations by MPD officers.

37.     That the American Civil Liberties Union, (ACLU) has filed a federal civil rights action against the City of Milwaukee and Milwaukee Police Department, alleging constitutional violations and deprivations, now pending in the Eastern District of Wisconsin, which has resulted in a *Consent Decree and Stipulation*, which is still not being followed by MPD officers.

38.     That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was/is the failure to discipline MPD officers for misconduct, as set forth in the preceding paragraphs.

39.     That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was/is the "code of silence" that exists within the MPD, even though this code may be contrary to the express policies of MILWAUKEE.

40.     That the MPD's "code of silence" is where MPD officers do not report the misconduct of their fellow officers due to the fear of retaliation.

41.     That MILWAUKEE has taken no action with respect to any MPD officer following the "code of silence" by refusing to testify in a civil or criminal proceedings.

42.     That, in 2009, MPD Chief of Police Edward A. Flynn ("FLYNN") admitted that the "code of silence" exists within the MPD.

43.    That the "code of silence" presently exists within the MPD and is currently the custom and policy of MILWAUKEE.

44.    That part of MILWAUKEE's custom of condoning constitutional rights violations by MPD officers is the concept of ***"noble cause corruption"*** that exists within the MPD, even though this concept may be contrary to the express policies of MILWAUKEE.

45.    That the concept of "noble cause corruption" is where MPD officers engage in misconduct because they believe they are accomplishing a greater good.

46.    That, in 2012, FLYNN admitted that the concept of "noble cause corruption" exists within the MPD.

47.    That MILWAUKEE's custom of condoning constitutional rights violations by MPD officers was the moving force behind the constitutional violations suffered by JOSEPH WALKER.

48    That the constitutional violations suffered by JOSEPH WALKER happened because these DEFENDANTS were following the concept of "***noble cause corruption***," engaging in unlawful detentions, unreasonable searches and uses of excessive force, because he believed that such actions would serve the greater good of the community.

49. That, had MILWAUKEE not maintained a custom of condoning constitutional violations, the constitutional violations suffered by JOSEPH WALKER would not have occurred.


**Widespread Pattern of Constitutional Violations**

50.    That there is a long history of constitutional violations committed by MPD officers that were caused by the policies and customs of MILWAUKEE. That the constitutional violations include, but are not limited to, the events listed below.

51.     That, in 1958, MPD Officer Thomas Grady planted a knife on Daniel Bell to support his false claim that Mr. Bell was armed and attacked him.

52.     That MPD Officer Louis Krause followed the MPD's "code of silence" by conspiring with MPD Officer Thomas Grady to lie about the incident which led to the fatal shooting of Daniel Bell.

53.     That between 1979 and 1980, the United States Department of Justice ("DOJ") conducted an investigation into a possible pattern of misconduct within the MPD.

54.     That former MPD Chief of Police Harold Brier refused to cooperate with the DOJ investigation.

55.     That the DOJ investigation found that 22 people died in MPD custody between 1975 and 1979.

56.     That the DOJ investigation ultimately determined that there was no accountability for former MPD Chief of Police Harold Brier.

57.     That, in 1981, Ernest Lacy died in MPD custody after MPD officers used excessive force against him and then failed to provide him with medical assistance.

58.     That, despite a medical examiner documenting over 30 cuts and bruises on Ernest Lacy's body, and witnesses' accounts describing MPD officer use of excessive force against Mr. Lacy, former MPD Chief of Police Harold Brier claimed that MPD officers did nothing wrong during the incident that resulted in the death of Mr. Lacy.

Case 2:20-cv-00487-NJ   Filed 03/26/20   Page 10 of 27   Document 1

59.     That former MPD Chief of Police Harold Brier refused to cooperate with any federal investigation into the death of Ernest Lacy.

60.     That, in 1988, MPD officers shot Tandy O'Neal in the back, rendering Mr. O'Neal a quadriplegic.

61.     That a MPD Detective, following the MPD's "code of silence," initially stated that Tandy O'Neal struggled with MPD officers prior to being shot.

62.     That the MPD Detective eventually admitted that his statement regarding Tandy O'Neal struggling with MPD officers was not true.

63.     That, in 2003, MPD Officer Craig Nawotka shot and killed Justin Fields.

64.     That MPD Officer Craig Nawotka shot Justin Fields in the back as Mr. Fields was slowly driving away from MPD officers.

65.     That MPD Sergeant Harold Hampton, who conducted the MPD internal investigation into MPD Officer Craig Nawotka's shooting of Justin Fields, testified under oath that the head of the MPD internal affairs division ignored Sergeant Hampton's findings that Officer Nawotka violated several MPD rules during the incident that resulted in the shooting of Mr. Fields.

66.     That MILWAUKEE settled a civil rights action filed by the family of Justin Fields for $1.6 million.

67.     That, in 2003, MPD Officer Kevin Clark slammed Curtis Harris' head into the wall and floor of the MPD District 3 Police Station booking room.

68.     That, as a result of MPD Officer Kevin Clark's actions, Curtis Harris was rendered a quadriplegic.69.     That MPD Officer Kevin Clark claimed that Curtis Harris was trying to hit him, but video from the incident refuted Officer Clark's claim.

70. That MILWAUKEE settled a federal civil rights action filed by Curtis Harris for $3 million.

71. That MILWAUKEE took no action against MPD Officer Kevin Clark for his actions during the incident with Curtis Harris.

72. That MPD Officer Kevin Clark was later fired from the MPD after he pleaded guilty to insurance fraud after collecting worker's compensation benefits for injuries he sustained while sledding on duty.

73. That MPD Officer Kevin Clark and other MPD officers followed the MPD's "code of silence" by covering up the sledding while on duty incident.

74. That, although they initially denied any involvement in the Jude incident, several MPD officers ultimately pleaded guilty in federal court to violating Frank L. Jude, Jr. 's constitutional rights.

75. That, following a federal criminal trial, a jury determined that several other MPD officers violated Frank L. Jude, Jr. 's constitutional rights.

76. That MILWAUKEE settled Frank L. Jude, Jr. 's federal civil rights action for $2 million.

180. In March 2005, MPD Officer Alfonzo Glover shot and killed Wilbert Prado.

77. That, following the trial on the Prado family's federal civil rights action, a jury determined that MPD Officer Alfonzo Glover violated Wilbert Prado's constitutional rights.

78. That MIILW AUKEE ultimately settled the Prado family's federal civil rights action.

79. That, in 2012, MPD Sergeant Jason Mucha was reassigned after multiple complaints of invasive body cavity searches.

80. That, within a three-year time period, Sergeant Mucha was accused at least ten times of using excessive force and/or planting drugs on citizens.

81.     That, in August 2005, the Milwaukee County Circuit Court, the Honorable Charles F. Kahn, Jr. presiding, ruled that several persons who had accused Sergeant Mucha of using excessive force could testify in a criminal case where the defendant accused Sergeant Mucha of using excessive force. (*State of Wisconsin v. Lemar Barnes*, Milwaukee County Case Number 04-CF-1001, Amended Decision of Admissibility of Evidence, dated August 10, 2005).

82.     That, on March 14, 2006, the Court of Appeals of Wisconsin issued an opinion reversing a trial court decision that denied a criminal defendant's request to introduce evidence that Sergeant Mucha had used excessive force and/or planted drugs on other persons. (State of Wisconsin v. Walter T. Missouri, 2006 WI App 74).

83.     That, between 2000 and 2007, the MPD investigated Sergeant Mucha for seven battery complaints, four unreasonable search complaints, two theft complaints and one false arrest complaint.

84.     That the MPD claimed that all the complaints against Sergeant Mucha set forth in the preceding paragraph were either unfounded or unsubstantiated.

85.     That the MPD either failed to notice or intentionally disregarded a pattern and/or trend with respect to Sergeant Mucha's misconduct.

86.     That, on July 6, 2011, Derek Williams died in MPD custody after MPD officers may have used excessive force against Mr. Williams and then failed to provide Mr. Williams with medical assistance, despite the fact that Mr. Williams was in the back seat of an MPD squad car struggling to breathe and begging MPD officers for help.

87.     That an Inquest was held to determine whether any of the MPD officers involved should face criminal charges as a result of the death of Derek Williams.

87.     That, following the conclusion of testimony, the Derek Williams Inquest jury issued an advisory verdict that MPD Officers Richard Ticcioni, Jason Bleichwehl and Jeffrey Cline should be criminally charged pursuant to Wisconsin Statute Section 940.291, Law Enforcement Officer; Failure to Render Aid.

88.     That, despite the Derek Williams Inquest jury's advisory verdict, the special prosecutor who conducted the Inquest refused to bring criminal charges against Officers Ticcioni, Bleichwehl and Cline.

89.     That MILWAUKEE took no action against Officers Ticcioni, Bleichwehl, Cline, or any other MPD officers involved in the death of Derek Williams.

90.     That, on September 22, 2011, MPD Officer Richard Schoen used excessive force against a woman in his custody by punching her in the face multiple times, grabbing her by the hair as he removed her from an MPD squad car, and kneeing her in the stomach.

91.     That the MPD fired Officer Schoen as a result of his actions on September 22, 2011.

92.     That the FPC then reversed the MPD's decision to fire Officer Schoen and instead gave him his job back, suspending him for 60 days.

93.     That, following a public outcry, the FPC reinstated the MPD's decision to fire Officer Schoen.

94.     That, in 2013, a jury determined that MPD Detective Rodolfo Gomez either intentionally, or with reckless disregard for the truth, made false or misleading statements in an affidavit accompanying a search warrant application, awarding the victim of Detective Gomez's misconduct $1,000,000. (*Richard Betker v. Rodolfo Gomez*, United States District Court for the Eastern District of the United States Case Number 08-CV-760, Verdict Form dated November 20, 2013).

95.     That, from approximately 2008 to 2012, several MPD officers conducted illegal pat-down searches, illegal strip searches and illegal body cavity searches of numerous individuals.

201. That over 70 individuals alleged federal civil rights claims against the MPD officers for the illegal pat-down searches, illegal strip searches and illegal body cavity

searches.

96.     That MILWAUKEE settled the individuals' federal civil rights claims involving the illegal pat-down searches, illegal strip searches and illegal body cavity searches for $5 million.


**"THE ENCOUNTER"**

97.     That on April 5th, 2014, a NON-emergency call was placed to MPD from Plaintiff's mother, advising that Plaintiff was distraught and contemplating suicide, along with a history of mental health issues of depression, at 2559 S. 15th Street, Milwaukee, Wisconsin.

98.     That Defendants responded to the call and saw that Plaintiff's mother and son were outside of the home and no longer in danger.

99.     That the Defendants had never encountered the Plaintiff's mother on prior occasions, so as to establish her credibility or veracity.

100.    That the Defendants, based upon the call, were advised that the Plaintiff legally owned and possessed firearms in the home he shared with his mother and son.

101.    That the Plaintiff did not have any weapon on or about his person, as he stood on his front porch, when confronted by Defendants, who were heavily armed with automatic weapons and assault rifles.

102.    That the Plaintiff was never advised that he had committed any crime or was under arrest by any MPD officer.

103.    That no MPD officer or official ever advised the Plaintiff that he was being secured for placement under Wisconsin Statute, Chapter 51, for temporary placement in a mental facility to determine if he posed a threat to himself or anyone else, due to his present state of mind or depression.

104.    That MPD officers, including these Defendants, knew or should have known, that the Plaintiff merely needed his Ambien medication to control his depression, which had run out and his mother had agreed to secure at the pharmacy as part of a plan devised by MPD Defendants to draw the Plaintiff from his home.

105.    That Defendant LISA PURCELLI did advise everyone that she believed Plaintiff was armed, although not clearly seeing any weapon while Plaintiff stood on his front porch.

106.    That the Defendants, including Defendant Boll then opened fire, on the Plaintiff, shooting him in the back, unarmed, as he began to walk back into his home.

107.    That Defendant BALBIR MAHAY, began shooting blindly through Plaintiff's door and wall, hoping to mortally wound Plaintiff, with automatic gunfire.

108.    That AFTER the fusillade of gunfire, the Defendants asked the Plaintiff to exit the home so "they could get him some help".

109.    That after Plaintiff advised these Defendants that they had shot him, one or more of these Defendants then grabbed him by his shirt and dragged him down the front steps, instead of tending his gunshot wounds.

110.    That these Defendants noted a gunshot wound centered in Plaintiff's back, which by common sense would indicate a life threatening position to any layperson, yet these Defendant left the Plaintiff handcuffed on the ground, having cut his shirt off to verify if Plaintiff "was lying".

111. That the Defendants did or should have known that they lacked probable cause to effect any lawful arrest of the Plaintiff, as they had not witnessed any crime committed in their presence.

112. That the Defendants did or should have known that they lacked probable cause to effect any civil or administrative commitment of the Plaintiff under Wisconsin Statute, Chapter 51, regarding any suicidal ideations, as Plaintiff had not made such comments in the presence of any MPD personnel or Defendant named herein.

113. That the Defendants knew or should have known that they lacked any legal justification whatsoever for opening fire on Plaintiff, inflicting life threating gunshots to Plaintiff, causing him severe pain, loss of blood, permanent disfigurement and emotional or psychological distress which will likely permanently disable Plaintiff for the remainder of his life.


# CAUSES OF ACTION

**First Cause of Action**
Title 42, United States Code, Section 1983 Unlawful Arrest & Detention against Defendants

114. PLAINTIFF re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

115. That JOSEPH WALKER had a constitutionally protected right not to be unlawfully detained, arrested and shot.

116. That, as set forth in the preceding paragraphs, these Defendants unlawfully detained, arrested and shot JOSEPH WALKER.

117. That the Defendants acted under color of law.

118.    That the Defendants' unlawful detention and arrest resulted in the shooting of JOSEPH

WALKER.


## Second Cause of Action

Title 42, United States Code, Section 1983 Unreasonable Search against the Defendants.


119.    PLAINTIFF re-alleges, and incorporates by reference, the allegations of the preceding

paragraphs.

120.    That JOSEPH WALKER had a constitutionally protected right to be free from

unreasonable searches and seizures.

121.    That, as set forth in the preceding paragraphs, THE DEFENDANTS deprived JOSEPH

WALKER of his constitutionally protected right to be free from unreasonable searches and

seizures.

122.    That the Defendants intentionally caused the deprivation of JOSEPH WALKER's right to

be free from unreasonable searches and seizures.

123.    That the Defendants acted under color of law.

124.    That the Defendants' unreasonable search resulted in the shooting of JOSEPH WALKER


## Third Cause of Action

Title 42, United States Code, Section 1983 Excessive Force against the Defendants


125.    PLAINTIFF re-alleges, and incorporates by reference, the allegations of the preceding

paragraphs.

126. That JOSEPH WALKER had a constitutionally protected right not to have excessive force used against him.

127. That, as set forth in the preceding paragraphs, the defendants used excessive force against JOSEPH WALKER.

128. That the Defendants intentionally used excessive force against JOSEPH WALKER.

129. That the defendants acted under color of law.

130. That the defendants' use of excessive force resulted in the shooting of JOSEPH WALKER.

## Fourth Cause of Action

Title 42, United States Code, Section 1983
Denial of Right to Counsel

131. PLAINTIFF re-alleges, and incorporates by reference, the allegations of the preceding paragraphs.

132. That the conduct and Policy of the Defendants, as set forth in the preceding paragraphs, resulted in the denial of Plaintiff's right to counsel.

## Fifth Cause of Action

Wisconsin Statute Section 895.46 Indemnification against MILWAUKEE

133. PLAINTIFF re-alleges, and incorporates by reference, the allegations in the preceding paragraphs.

134. That, at all times material hereto, the Defendants were carrying out their duties as a MPD officer or agents of Milwaukee Police Department and were acting within the scope of their employment with MILWAUKEE.

135. That the conduct of the Defendants, as set forth in the preceding paragraphs, resulted in the shooting of JOSEPH WALKER.

136. That MILWAUKEE is liable, pursuant to Wisconsin Statute Section 895.46, for any judgment entered against the Defendants in this action because, at all times material hereto, the Defendants were carrying out their duties as an MPD officers or agents, and were acting within the scope of their employment with MILWAUKEE.

### Sixth Cause of Action

Title 42, United States Code, Section 1983
Deficient Hiring and Continued Employment Policy against MILWAUKEE

137. PLAINTIFF re-alleges, and incorporates by reference, the allegations in the preceding paragraphs.

138. That, at all material times hereto, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

139. That, prior to 2005, MILWAUKEE had an official policy with respect to the hiring and continued employment of MPD officers.

140. That, prior to 2005, the policy-makers of MILWAUKEE made a conscious choice from various alternatives to follow its official policy with respect to the hiring and continued employment of MPD officers.

141.    That, prior to 2005, MILWAUKEE's official policy with respect to the hiring and continued employment of MPD officers was deficient in that it did not include administration of complete psychological testing of police officer candidates.

142.    That, prior to 2005, the policy-makers of MILWAUKEE permitted the hiring of certain MPD officers, even though complete psychological testing would lead an objectively reasonable policy-maker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and ( c) the right to be free from the use of excessive force.

143.    That, prior to 2005 and continuing to the present, the policy-makers of MILWAUKEE permitted/permit the continued employment of certain MPD officers, even though complete psychological testing would lead an objectively reasonable policy-maker to conclude, as set forth in the preceding paragraphs, that said police officers would be highly likely to deprive third parties of their constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and ( c) the right to be free from the use of excessive force.

144.    That the policy-makers of MILWAUKEE knew or should have known that, as set forth in the preceding paragraphs, complete psychological testing of police officer candidates was needed to avoid highly likely deprivations of constitutional rights, including, but not limited to: (a) the right not to be unlawfully detained; (b) the right to be free from unreasonable searches; and ( c) the right to be free from the use of excessive force.

145. That MILWAUKEE's deficient policy with respect to the hiring and continued employment of MPD officers caused the violation of the JOSEPH WALKER's constitutional rights, and the injuries and damages to the PLAINTIFF, as set forth in the preceding paragraphs.

146. That MILWAUKEE's official policy with respect to the hiring of MPD officers may be currently deficient in that it does not include administration of complete psychological testing of police officer candidates.

## Seventh Cause of Action

Title 42, United States Code, Section 1983 Failure to Train Policy against MILWAUKEE

147. PLAINTIFF re-alleges, and incorporates by reference, the allegations in the preceding paragraphs.

148. That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

149. That, prior to August 31, 2017and continuing to the present, the policy-makers of MILWAUKEE made/make a conscious choice from various alternatives to follow its official policies with respect to the training of MPD officers.

150. That, as set forth in the preceding paragraphs, prior to August 31, 2017and continuing to the present, MILWAUKEE's official policies with respect to the training of MPD officers were/are inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.

151. That, prior to August 31, 2017and continuing to the present, the policy-makers of MILWAUKEE knew or should have known that more and/or different training of MPD officers

with respect to: (a) encountering individuals who are suffering from mental illness and/or experiencing a crisis situation; (b) dealing with intense situations involving individuals who are suffering from mental illness and/or experiencing a crisis situation; and ( c) using force against individuals was/is needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policy-makers of MILWAUKEE.

152.    That MILWAUKEE's failure to provide adequate training to MPD officers caused the violations of JOSEPH WALKER' constitutional rights, and the injuries and damages to the PLAINTIFF, as set forth in the preceding paragraphs.

153.    That MILWAUKEE's official policies with respect to the training of MPD officers are currently inadequate with respect to the recurring situations of encountering individuals with mental illness and using force against individuals.


### Eighth Cause of Action
Title 42, United States Code, Section 1983 Failure to Discipline Policy against MILWAUKEE


154.    PLAINTIFF re-alleges, and incorporates by reference, the allegations in the preceding paragraphs.

155.    That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

156.    That, prior to August 31, 2017and continuing to the present, the policy-makers of MILWAUKEE made/make a conscious choice from various alternatives to follow its official policies with respect to the discipline of MPD officers.

157.    That, as set forth in the preceding paragraphs, prior to August 31, 2017and continuing to the present, MILWAUKEE's official policies with respect to the discipline of MPD officers

Case 2:20-cv-00487-NJ   Filed 03/26/20   Page 23 of 27   Document 1

were/are inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.

158. That, prior to August 31, 2017 and continuing to the present, the policy-makers of MILWAUKEE knew or should have known that more and/or different policies with respect to the discipline of MPD officers was/is needed to avoid likely unlawful detentions, unreasonable searches, and uses of excessive force; and/or that this was/is plainly obvious to the policy-makers of MILWAUKEE.

159. That MILWAUKEE's failure to discipline MPD officers caused the violations of JOSEPH WALKER' constitutional rights, and the injuries and damages to the PLAINTIFF, as set forth in the preceding paragraphs.

160. That MILWAUKEE's official policies with respect to the discipline of MPD officers are currently inadequate with respect to the recurring situations of unlawful detentions, unreasonable searches, and uses of excessive force.


**Ninth Cause of Action**

Title 42, United States Code, Section 1983

Custom of Condoning Constitutional Rights Violations against MILWAUKEE

161. PLAINTIFF re-alleges, and incorporates by reference, the allegations in the preceding paragraphs.

162. That, at all relevant times herein, MILWAUKEE was a "person" for purposes of Title 42 of the United States Code, Section 1983.

163. That the actions and/or inactions of the Defendants in unlawfully detaining, unreasonably searching, and using excessive force against JOSEPH WALKER were done in accordance with MILWAUKEE's custom of condoning constitutional rights violations.

164. That MILWAUKEE's custom of condoning constitutional rights violations was/is so persistent and widespread, as set forth in the preceding paragraphs, that it was/is MILWAUKEE's official policy.

165. That MILWAUKEE's custom of condoning constitutional rights violations permitted, encouraged, tolerated or ratified the actions and/or inactions of the Defendants, all in malicious or reckless disregard or with deliberate indifference regarding the constitutional rights of JOSEPH WALKER.

166. That the policy-makers of MILWAUKEE made/make a conscious choice from various alternatives to follow its custom of condoning constitutional rights violations.

167. That the policy-makers of MILWAUKEE acted with deliberate indifference to the consequences of its custom of condoning constitutional rights violations.

168. That MILWAUKEE's custom of condoning constitutional rights violations caused the violations of JOSEPH WALKER' constitutional rights, and the injuries and damages to the PLAINTIFF, as set forth in the preceding paragraphs.


# DEMAND FOR JUDGMENT

169. WHEREFORE, the PLAINTIFF demands judgment against the Defendants as follows:

a. In favor of the PLAINTIFF and against the Defendants and MILWAUKEE, as set forth in the preceding paragraphs, jointly and severally, for compensatory and special damages;

b. In favor of the PLAINTIFF and against the Defendants, as set forth in the preceding paragraphs, for punitive damages;

c. In favor of the PLAINTIFF and against MILWAUKEE, as set forth in preceding paragraphs, for its liability pursuant to Wisconsin Statute Section 895.46;

d. For injunctive and other equitable relief reforming the policies and customs of MILWAUKEE, to prevent like actions and harms in the future; and

e. For all costs, disbursements, interest and reasonable attorneys' fees pursuant to Title 42 of the United States Code, Section 1988, and for such other relief as the Court deems just and equitable.

PLAINTIFF HEREBY DEMAND A JURY TRIAL OF THIS ACTION
ON ALL ISSUES SO TRIABLE.

Dated this _19_ day of _March_, 2020.

By: _____

JOSEPH WALKER, Plaintiff
1008 S. 22nd Street
Milwaukee, Wisconsin
53204

JS 44 (Rev. 08/18)

# CIVIL COVER SHEET

## 20-C-0487

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

Place an "X" in the appropriate box (required): ☐ Green Bay Division ☒ Milwaukee Division

## I. (a) PLAINTIFFS
JOSEPH WALKER, pro se

**DEFENDANTS**
CITY OF MILWAUKEE et. al

**(b)** County of Residence of First Listed Plaintiff   **MILWAUKEE**
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   **MILWAUKEE**
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
1008 S. 22nd Street
Milwaukee, Wisconsin
53204

Attorneys *(If Known)*
CITY ATTORNEY
841 N Broadway # 716, Milwaukee, WI 53202

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1 U.S. Government
Plaintiff

☐ 3 Federal Question
*(U.S. Government Not a Party)*

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*
Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☒ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original
Proceeding

☐ 2 Removed from
State Court

☐ 3 Remanded from
Appellate Court

☐ 4 Reinstated or
Reopened

☐ 5 Transferred from
Another District
*(specify)*

☐ 6 Multidistrict
Litigation - Transfer

☐ 8 Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. 1983
Brief description of cause:

## VII. REQUESTED IN COMPLAINT:
☐ CHECK IF THIS IS A CLASS ACTION
UNDER RULE 23, F.R.Cv.P.

DEMAND $
$10,000,000

CHECK YES only if demanded in complaint:
JURY DEMAND: ☒ Yes ☐ No

## VIII. RELATED CASE(S) IF ANY
*(See instructions):*

JUDGE

DOCKET NUMBER

DATE
3-19-20

SIGNATURE OF ATTORNEY OF RECORD
*Joseph Walk*

FOR OFFICE USE ONLY

RECEIPT #      AMOUNT      APPLYING IFP      JUDGE      MAG. JUDGE