# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF WISCONSIN

---

JOSEPH WALKER,

      **Plaintiff,**

      **v.**                             **Case No. 20-CV-487**

CITY OF MILWAUKEE, et al.,

      **Defendants.**

---

## DECISION AND ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

In the early morning hours of April 6, 2014, Joseph Walker was shot multiple times by several Milwaukee Police Department ("MPD") officers. Walker sues the City of Milwaukee (the "City"), along with MPD Sergeant Tanya Boll and MPD Officers Balbir Mahay, Jeremy Gonzalez, Daniel Clifford, and Lisa Purcelli under 42 U.S.C. § 1983 for allegedly violating his constitutional rights. Specifically, Walker alleges that Boll, Mahay, Clifford, and Gonzalez used excessive force against him when shooting him (Count I) and that Gonzalez, Boll, Purcelli, Mahay, and Clifford failed to intervene to stop the excessive force (Count II). (Second Am. Compl., Docket # 45.) Finally, Walker sues the City for its alleged failure to train its officers. (Count III and Docket # 62 at 18 n.3.)

Defendants move for summary judgment in their favor on all three of Walker's causes of action. (Docket # 54.) For the reasons further explained below, the defendants' motion for summary judgment is denied.

## FACTS

On April 6, 2014, LuAnn Will was living with her husband, Raymond Will and her thirty-one-year-old son, Joseph Walker, at 2659 South 15th Street in Milwaukee, Wisconsin. (Defs.' Proposed Findings of Fact ("DPFOF") ¶ 1, Docket # 56 and Pl.'s Resp. to DPFOF ("Pl.'s Resp.") ¶ 1, Docket # 60; Declaration of Anthony Jackson ("Jackson Decl.") ¶ 8, Ex. F, Transcript of Jury Trial in *Wisconsin v. Walker*, Milwaukee County Case No. 14CF1494 ("JT Tr.") at 162, 167.) Walker's twelve-year-old son was also staying at the residence that day. (JT Tr. at 70, 162.)

Both Will and Walker had prescriptions for Ambien and would sometimes share prescriptions. (*Id.* at 157.) Will believed Walker abused Ambien (*id.* at 159), noting that once in early April 2014, Walker took an entire bottle of thirty, five milligram Ambien tablets in one night (*id.* at 160). In the early morning hours of April 6, 2014, Will asserts that Walker confronted her, demanding Ambien. (*Id.* at 163.) Will believed Walker was having a psychotic episode, describing him as looking like the "devil jumped in him." (*Id.*) Walker knew Will had a prescription of Ambien ready at Walgreens; however, Will did not plan on picking up the prescription on April 6. (*Id.* at 164.) Will described Walker as sweating profusely, noting he had not slept in two days. (*Id.*) Will stated that Walker threatened to kill her and then kill himself if she did not pick up her Ambien. (*Id.* at 165.) Will was afraid and believed Walker's threats that night because of the "psychotic look" in his eyes. (*Id.*) Walker's son was awake and sitting at the kitchen table with Walker, observing the exchange. (*Id.* at 166.) Walker, for his part, does not deny that he had an argument with his mother on April 6, 2014, and that he could have possibly made threatening statements to

2

her, but he asserts that he did not mean the threats. (Declaration of Samantha Baker ("Baker Decl.") ¶ 12, Ex. I, Deposition of Joseph Walker ("Walker Dep.") at 8, Docket # 59-9.)

Will wanted to get Walker out of the house and take him to the hospital. (JT Tr. 166.) Will was on the phone with her friend, Rose Crass, at the time of the encounter with Walker. (*Id.*) Crass suggested Will pretend she was leaving the house to get the Ambien prescription, but instead go to Crass' home about one mile away and call the non-emergency number for the police. (*Id.* at 166–67.) Will did so, driving to Crass' home while Walker, her grandson, and her husband (who was asleep upstairs), remained at the 15th Street residence. (*Id.* at 168.) Once at Crass' house, Will called the MPD's non-emergency phone line and told them that her son had severe mental health issues and that she needed someone to come and take him to Milwaukee Mental Health. (*Id.*) She stated that Walker was threatening to kill her and to kill himself and that there were weapons in the house. (*Id.*) Will was told that a tactical team would come over and that she was to go back to the residence and meet them around the corner near her home. (*Id.* at 169.)

The officers who responded to the scene testified consistently with Will's account up to this point. Officer Gonzalez and his partner, Officer Purcelli, were the first squad to arrive at the scene. (Jackson Decl. ¶ 7, Ex. E, Deposition of Lisa Purcelli ("Purcelli Dep.") at 23.) Will returned to the 15th Street residence around 12:30 or 12:45 a.m., and the police were around the corner on Cleveland Avenue. (JT Tr. at 170.) Will reiterated to Purcelli that Walker had mental health issues and needed treatment, that she was afraid of him, and that there were weapons in the house. (JT Tr. at 170–71; Purcelli Dep. at 20–25.) Other officers soon arrived at the scene including Sergeant Boll, Officer Clifford, and Officer Mahay. All of the officers consistently testified that the information they received, either

3

from dispatch or from other officers at the scene, was that Walker had weapons in the house, that Walker had threatened to kill himself and his mother, and that Walker was having a psychotic episode. (Jackson Decl. ¶ 3, Ex. A, Deposition of Jeremy Gonzalez ("Gonzalez Dep.") at 16–34; (Jackson Decl. ¶ 4, Ex. B, Deposition of Tanya Boll ("Boll Dep.") at 14–22); (Jackson Decl. ¶ 5, Ex. C, Deposition of Balbir Mahay ("Mahay Dep.") at 23–29); (Jackson Decl. ¶ 6, Ex. D, Deposition of Daniel Clifford ("Clifford Dep.") at 15–28.) The officers were also all aware that both Walker's twelve-year-old son and Will's husband were still in the house after Will left to supposedly fill the Ambien prescription. (Gonzalez Dep. at 27; Boll Dep. at 18; Mahay Dep. at 34; Purcelli Dep. at 18.)

Officer Gonzalez described Will as "very frantic, animated" when he and Purcelli arrived (Gonzalez Dep. at 27), recalling that she believed if Walker came out of the house, he would probably be armed (*id.* at 34). Purcelli testified that while meeting with Will, she appeared nervous and scared and told Purcelli that her son had not slept in days because he was addicted to Ambien and did not have any. (Purcelli Dep. at 23.) Purcelli looked Walker up on the squad computer so they could identify him. (*Id.* at 24.) While Purcelli was talking to Will, Walker called. (*Id.*) Will answered the call and put it on speaker phone right away. (*Id.* at 26.) Walker was agitated and demanding she tell him where she was and why it was taking so long for her to fill the prescription. (*Id.* at 26.) Purcelli testified that Walker's phone call confirmed to her what Will had relayed—that Walker had not slept and his psychotic state of mind. (*Id.* at 32.)

After Will received the call from Walker, the officers on scene all testified that a plan was devised to lure Walker out of the house and then take him into custody. (Gonzalez Dep. at 34–41; Boll Dep. at 26–31; Mahay Dep. at 34–35; Clifford Dep. at 26–27; Purcelli

4

Dep. at 33–36.) Gonzales testified that at some point the officers discussed calling the tactical enforcement unit; however, Walker's call to Will "stepp[ed] up the urgency" of removing Walker from the house. (Gonzalez Dep. at 41.) The plan involved having Will drive her vehicle north on 15th Street and turn the vehicle around and park. (Boll Dep. at 27.) The officers did not want Will to park directly in front of the residence, so the officers had some space between her vehicle and the front of the residence. (*Id.* at 28.) The officers would be stationed at various areas surrounding the house. (*Id.*) Will would then call Walker and ask him to come out of the house to retrieve the Ambien from her at her car because she was going to go on to her friend's house for the night. (Boll Dep. at 27; Purcelli Dep. at 35.) Once he was outside, the plan was to take Walker into custody for mental health treatment and/or on criminal charges for threatening Will. (Boll Dep. at 27–28.) Boll testified that a rifle officer, Officer Mahay, was called to the scene as well because Will stated that Walker had an AK-47, a shotgun, and a nine-millimeter handgun in the house, all laid out in his bedroom. (*Id.* at 33–34.)

Gonzalez was positioned on the east side of 15th Street, just south of the residence, but "pretty much in front of it behind a parked car." (Gonzalez Dep. at 44.) At this time, Gonzalez did not have his gun out. (*Id.* at 48.) Boll was standing behind a van with her weapon in the "low ready" position. (Boll Dep. at 53.) Mahay was positioned behind a tree across from Walker's house. (Mahay Dep. at 44.) His rifle was drawn. (*Id.* at 49.) Clifford was instructed to go to the neighboring house south of Walker's residence and serve as containment. (Clifford Dep. at 31.) And Purcelli was positioned across the street in a gangway between two houses, but she had a direct view of Walker's house. (Purcelli Dep. at 45.)

5

After all of the officers were in position, Purcelli testified that she called Will's husband to inform him of what was going on and to have him get out of the house. (Purcelli Dep. at 47.) An officer then came over the radio to let the other officers know that Will was placing the call to Walker to come out and get the medication. (*Id.*) Will testified that she called Walker and told him that she was right around the corner on 16th Street and that he should come out and get the Ambien because she was going to go back to her friend Crass' house to pick up some money. (JT Tr. 173.) Will testified that Walker said he did not trust her, so he was going to send his son out to get the medication. (*Id.*) Walker agrees that he received a phone call from his mother to come out to get the pills because she had to go somewhere and that he sent his son out to get the pills from Will. (Walker Dep. at 12, 15–16.) The officers similarly testified that rather than Walker exiting the residence, they observed his twelve-year-old son came out of the residence and head towards Will's vehicle. (Gonzalez Dep. at 50; Boll Dep. at 54–55; Mahay Dep. at 53; Clifford Dep. at 53; Purcelli Dep. at 53, 60.)

Walker exits the residence shortly thereafter. (Walker Dep. at 19.) Although all of the officers testify that they observed Walker exit the residence, the observations of each officer differ slightly from each other and differ significantly from Walker's account. Gonzalez testifies that Walker comes out of the residence and onto the porch and looks down the block to the south towards the police wagon and points with his left hand. (Gonzalez Dep. at 53, 58.) Gonzalez states that Walker's right hand was up against his chest as if he was concealing something, and Gonzalez believed that something was a firearm. (*Id.*) Gonzalez testified that Walker was yelling something towards Will's vehicle, and he appeared to be getting more irritated. (*Id.* at 73.)

6

Boll testified that after Walker exited the house, he started yelling "what's going on? What are the police doing here?," yelling obscenities, and seemed very angry. (Boll Dep. at 56, 69–70.) Boll testifies that she saw Walker holding a dark object in his right hand near his chest. (*Id.* at 65.) She testified that Walker's left hand was down by his side. (*Id.* at 66.) Mahay testified that after Walker exited the residence, Walker yelled at Will "What the fuck?" and "Why are police here?" (Mahay Dep. at 52.) Mahay stated that Walker's right hand was on his chest area, and it appeared that he was holding a black object in his right hand. (*Id.* at 58–59.) Mahay did not know what Walker's left hand was doing. (*Id.* at 59.) Mahay believed the black object in Walker's right hand was a handgun. (*Id.* at 61.)

Clifford testified that after leaving the residence, Walker appeared paranoid and was looking around, and at one point became really agitated and yelled out to Will, "Why is there police tape? Did something happen?" (Clifford Dep. at 53–54.) Clifford had his gun drawn, but he could not see either of Walker's hands. (*Id.* at 61.) However, he believed based on Walker's body position and Will's statements, that Walker was armed. (*Id.* at 97.) Purcelli testified that Walker was wearing a black hooded sweatshirt and that he had one hand on his chest and the other hand up his sweatshirt. (Purcelli Dep. at 62.) She testified that it was his right hand up underneath his sweatshirt. (*Id.*) Purcelli stated that Walker was pacing back and forth on the top step of the porch and yelling to his mother. (*Id.* at 66–67.) Purcelli testified that Walker asked Will why the police were there. (*Id.* at 67–68.)

Walker testified that prior to exiting the residence, his emotional state was "fine," stating he "was smiling happy on the porch" and was neither angry nor upset. (Walker Dep. at 50.) Walker stated that while Will was out getting the Ambien, Walker was in his room with his son watching YouTube videos and laughing, having a good time. (*Id.* at 11–12.)

7

Walker testified that after exiting the house, he went out on the front porch, but he did not see any officers, only his mother and son. (*Id.* at 19.) Walker testified he thought he saw police tape, so he tried to get a hold of his mother and son to ask whether it was police tape since he did not see any police vehicles. (*Id.*) Walker pointed up the block, asking about the police tape. (*Id.* at 22.) Although Walker acknowledged that sometimes he spoke loudly so his mother and son could hear him, he testified that it was a quiet night, so he did not have to yell. (*Id.*) Walker testified after going out on the porch, he was holding his coat with both hands and eventually pointed with his right hand up the block. (*Id.* at 41–42.) He asked his son to ask his grandmother what was going on outside as he thought he saw police tape up the block. (*Id.* at 42–43.)

The officers and Walker also contest the next sequence of events. Gonzalez testified that officers began yelling, "Police, drop the gun" (Gonzalez Dep. at 65), but Walker did not stop and instead stepped off the porch in the direction of his son and Will's vehicle. (*Id.*) Gonzalez then fired his weapon once, and then heard several other shots after that. (*Id.* at 74.) While Gonzalez was unsure whether Walker made it down to the front stair or just somewhere on the stairway of the front porch, he testified that he "definitely didn't fire that first shot until he started walking down the stairs." (*Id.* at 81.) Gonzalez testified that when he fired his first shot, Walker's whole body was turned as if he was going to run back into the house. (*Id.* at 82.) Gonzalez testified that he believed Walker was armed, "and when he stepped off that porch, I believed he was going towards his kid and his mom who he had previously threatened to harm or kill, and I figured, if I didn't take action, I was going to watch it happen in front of me." (*Id.* at 84.)

8

Boll stated that officers started yelling at Walker to put the gun down and put his hands up. (Boll Dep. at 68, 74.) Boll testified that Walker started walking down the stairs and then made it all the way down the stairs. (*Id.* at 78–80.) As Walker walked down the stairs, Boll states that Walker was looking in the direction of Will's vehicle and yelling. (*Id.* at 82.) Boll testifies that as Walker walks down the stairs, officers are yelling commands that Walker disregards. (*Id.* at 84.) He continues walking, he does not put his hands up, and he is looking in the direction of his mother and son. (*Id.*) Boll testifies that Walker then makes a movement like he is going to head in the direction of Will and his son, and Boll discharges her weapon. (*Id.* at 86.)

Mahay testified that Walker was told to put his hands up, and when he moved his hand up, Mahay could clearly see that Walker had a gun in his hand. (Mahay Dep. at 64, 67.) Mahay testified that somebody shouted that Walker had a gun, and Mahay heard one gunshot. (*Id.* at 67.) After hearing the gunshot, Mahay testified that he took aim and shot his rifle approximately six times. (*Id.* at 68.)

Clifford testified that he heard someone say to drop the gun. (Clifford Dep. at 68.) After the order to drop the gun, Clifford saw Walker make a sudden movement turning towards Will and his son. (*Id.* at 70–71.) Clifford heard a shot, and after hearing the first shot, Clifford moves in front of the neighboring house and discharges his firearm. (*Id.* at 84–85.)

Purcelli testified that she could only remember Walker moving around on the very top of the porch, not on the steps, but that he was moving all around while yelling at Will. (Purcelli Dep. at 77.) Purcelli testified that she could not recall hearing any commands being yelled at Walker prior to shots being fired. (*Id.* at 78.) However, she recalled hearing officers

yell out commands to Walker after he was shot. (*Id.*) Purcelli testified, however, that she was occupied at that time with phone calls and on the radio. (*Id.* at 79.) Purcelli stated that although she did not see Walker with a gun, she believed he might have been armed under his sweatshirt. (*Id.* at 90.) However, she did not have enough information to have taken a shot at him, so she did not shoot. (*Id.*)

Walker testified that after getting no response from his mother and son regarding the police tape, he concluded that it did not matter since it was not in front of his house and decided to go back inside. (Walker Dep. at 50–51.) Walker testified that he turned around and took a couple of steps into the doorway when he was shot in the back. (*Id.* at 51.) Walker stated that his back was to his mother and son prior to the shots being fired as he was going back into the house. (*Id.* at 48–49.) Walker believes he was shot more than once and fell in the house, collapsing on the right side into the living room. (*Id.* at 51.) He testified he heard 15 to 20 shots fired. (*Id.* at 47.) Walker contends that he was not armed when he went outside. (*Id.* at 55.)

Will testified that when Walker came out of the house, he was at the top of the stairs, but not near the door, just standing on the porch with his hands in his pockets, watching. (JT Tr. at 182–83.) Will testified that her grandson came over to her car and kept asking her for his father's pills, and she kept asking him to get in the car. (*Id.* at 178.) Will heard Walker ask why there was police tape and squad cars down the street. (*Id.*) Will then heard the police shooting at her son and her grandson took off running between her house and the neighbor's house. (*Id.* at 178–79.) Will testified that Walker was still on the porch before she heard the shots fired. (*Id.* at 179.)

Walker contends that after he was shot, several officers ran up to him, picked him up, and slammed him, "beating [his] body up" while face-down in glass before handcuffing him at the top of the porch. (Walker Dep. at 62.) Walker testifies that the officers then dragged him down the stairs, and his back and head "went down the steps, 'boom' down the concrete." (*Id.* at 63.)

With the exception of Mahay, while the other officers testified they thought Walker had a gun, they testified that they did not actually see a gun. (Gonzalez Dep. at 67; Boll Dep. at 61; Clifford Dep. at 70; Purcelli Dep. at 82.) The MPD was not equipped with body cameras at the time of this incident. (DPFOF ¶ 102 and Pl.'s Resp. ¶ 102.)

## SUMMARY JUDGMENT STANDARD

The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. The mere existence of some factual dispute does not defeat a summary judgment motion. A dispute over a "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

In evaluating a motion for summary judgment, the court must draw all inferences in a light most favorable to the nonmovant. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Celotex Corp.*, 477 U.S. at 324. Evidence relied upon

11

must be of a type that would be admissible at trial. *See Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009). To survive summary judgment, a party cannot rely on his pleadings and "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248. "In short, 'summary judgment is appropriate if, on the record as a whole, a rational trier of fact could not find for the non-moving party.'" *Durkin v. Equifax Check Services, Inc.*, 406 F.3d 410, 414 (7th Cir. 2005) (citing *Turner v. J.V.D.B. & Assoc., Inc.*, 330 F.3d 991, 994 (7th Cir. 2003)).

## ANALYSIS

Walker brings three causes of action against the defendants under 42 U.S.C. § 1983. To succeed on a claim under § 1983, Walker must prove: (1) the deprivation of a right secured by the Constitution or federal law and (2) that defendants were acting under color of state law. *Wilson v. Warren Cty., Illinois*, 830 F.3d 464, 468 (7th Cir. 2016). Again, Walker alleges that Boll, Mahay, Clifford, and Gonzalez used excessive force against him when shooting him (Count I) and that Gonzalez, Boll, Purcelli, Mahay, and Clifford failed to intervene to stop the excessive force (Count II). (Second Am. Compl.) Walker also sues the City for its alleged failure to train its officers (Count III). (*Id.*) I will address each claim in turn.

> 1. *Excessive Force Claim*

Walker alleges that Boll, Mahay, Clifford, and Gonzalez violated his constitutional rights to be free from unreasonable seizures and to have equal protection of the law under the Fourth and Fourteenth Amendments when they fired their firearms at him. (Second Am. Compl. ¶ 40.) A police officer's use of deadly force constitutes a seizure within the meaning of the Fourth Amendment, and therefore it must be reasonable. *Scott v. Edinburg*,

346 F.3d 752, 755 (7th Cir. 2003). The Supreme Court has outlined the principles for evaluating whether the use of deadly force is reasonable under the Fourth Amendment:

> Where the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force. Thus, if the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and if, where feasible, some warning has been given.

*Id.* at 755–56 (quoting *Tennessee v. Garner*, 471 U.S. 1, 11–12 (1985)). Whether an officer used excessive force is "fact-specific" and "depends on the totality of the circumstances surrounding the encounter." *Id.* at 756. Whether intentional use of deadly force by a police officer is permissible under the Fourth Amendment requires an objective reasonableness inquiry. *Id.* The officer's subjective belief or motivations are irrelevant. *Id.* "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham v. Connor*, 490 U.S. 386, 396 (1989). Furthermore, "[t]he calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.* at 396–97.

"What is important is the amount and quality of the information known to the officer at the time he fired the weapon when determining whether the officer used an appropriate level of force." *Muhammed v. City of Chicago*, 316 F.3d 680, 683 (7th Cir. 2002). Thus, "when an officer believes that a suspect's actions [place] him, his partner, or those in the immediate vicinity in imminent danger of death or serious bodily injury, the officer can reasonably exercise the use of deadly force." *Id.* (internal quotation and citation omitted).

13

Defendants argue that Gonzalez, Boll, Mahay, and Clifford were responding to a serious crime involving a weapon—Walker had threatened to kill both his mother and himself if his mother did not fill her Ambien prescription for him. (Docket # 55 at 6.) Defendants further argue that when Walker came out of the residence, his body was in a position as if he were attempting to conceal a firearm, and Mahay testified that he saw Walker in possession of a firearm. (*Id.* at 7.) Then, when Walker moved in the direction of his mother and son, the officers reasonably believed that Walker posed an imminent threat to their safety. (*Id.*) Defendants argue that Walker's agitated state and yelling while on the porch bolsters the reasonableness of the officers' actions. (*Id.*) Finally, the defendants argue that Walker's failure to respond to the officers' commands to "drop the gun" further supports the use of deadly force. (*Id.* at 9.)

If the defendants' stated facts were indeed uncontested, the defendants would have a stronger argument that the officers' use of deadly force was objectively reasonable under the circumstances. But the facts in this case are not uncontested, and the defendants acknowledge as much. (Docket # 63 at 3 ("The Defendants recognize that there are disputed facts in this case, including whether officers gave any lawful commands to the Plaintiff prior to discharging their firearms.").) And the disputed facts in this case are material to the analysis of whether the use of deadly force was reasonable.

As an initial matter, some facts are indeed uncontested. The parties largely agree on the facts that brought the officers to Will's residence on the morning of April 6, 2014. Walker agrees that a confrontation occurred between Will and himself and that he "said some things" that could have possibly included threats to harm himself and/or his mother. (Walker Dep. at 7–8, 76.) He testified that he has a "short temper" and that people "say

14

things they don't mean." (*Id.* at 74.) Walker admitted that he had multiple firearms in the house, including a handgun, shotgun, and rifle. (*Id.* at 32–33.) Will also testified that she felt afraid of Walker that night. (JT Tr. 165–66.) Once the officers reached Will's residence; however, and Walker steps out of the house, the parties' recitation of the facts significantly diverge.

The parties do not agree on Walker's demeanor after he steps out of the house and onto the front porch. Officer Gonzalez testified that Walker was yelling and appeared to be getting increasingly irritated. (Gonzalez Dep. At 73.) Boll testified that Walker was very angry and was yelling, "What's going on? What are the police doing here?," as well as obscenities. (Boll Dep. at 69–70.) Mahay testified that Walker yelled "What the fuck?" and "Why are police here?" to Will. (Mahay Dep. at 52.) Clifford described Walker as looking paranoid, looking around, and at one point becoming really agitated and yelling out to Will, "Why is there police tape? Did something happen?" (Clifford Dep. at 53–54.) And Purcelli testified that Walker was pacing back and forth on the top step of the porch and yelling to his mother, asking why the police were down there. (*Id.* at 66–68.)

In contrast, Walker testified that just prior to leaving the residence, he had been in his room with his son watching YouTube videos and laughing, having a good time. (Walker Dep. at 11–12.) He testified that he was neither angry nor upset and was "smiling happy on the porch." (*Id.* at 50.) Walker testified that while he was asking his mother and son whether there was police tape down the road and if something had happened, he was not yelling. (*Id.* at 22.) Will testified that while Walker was asking why there was police down at the end of the street, Walker was just standing on the porch with his hands in his pockets. (JT Tr. 177, 182–83.)

15

Nor do the parties agree on the positioning of Walker's body and whether he was armed with a firearm when he exited the residence. While Mahay testifies that he saw a gun on Walker (Mahay Dep. at 64, 67), no other officer actually saw a weapon (Gonzalez Dep. at 67; Boll Dep. at 61; Clifford Dep. at 70; Purcelli Dep. at 82), and Walker testified that he was not armed when he left the house (Walker Dep. at 55). Further, while Gonzalez, Boll, and Mahay testified they thought Walker was concealing an object in his right hand and had his right hand up near his chest (Gonzalez Dep. at 58; Boll Dep. at 65; Mahay Dep. at 58–59), Purcelli testified that Walker had his right hand up underneath his sweatshirt (Purcelli Dep. at 62), and Walker testified that he used his right hand to point up the block at the police tape (Walker Dep. at 41–42). Will testified that Walker had his hands in his pockets. (JT Tr. 182–83.)

The parties also dispute whether the officers shouted commands at Walker that he ignored. Gonzalez, Boll, Mahay, and Clifford all testify that the officers yelled something to the effect of "drop the gun" and/or "put your hands up" to Walker, who disregarded the orders. (Gonzalez Dep. at 65; Boll Dep. at 68, 74; Mahay Dep. at 64, 67; Clifford Dep. at 68.) Purcelli testified that she could not recall hearing any commands being yelled to Walker prior to shots being fired, though she recalled hearing commands yelled *after* Walker was shot. (Purcelli Dep. at 78.) Walker similarly testified that he did not hear any officers yelling commands to him until after shots were fired. (Walker Dep. at 25.)

Most importantly, however, there is a dispute as to whether Walker took any aggressive steps towards his mother and son prior to the officers firing their weapons. Gonzalez testified that Walker stepped off the porch and began walking in the direction of his mother and son prior to shooting his firearm. (Gonzalez Dep. at 73–74.) Boll testified

16

that before firing her weapon, Walker made a movement like he was going to head in the direction of his mother and son. (Boll Dep. at 78–82, 84.) Clifford testified that before shooting his weapon, Walker made a sudden movement towards his mother and son. (Clifford Dep. at 70–71.) Purcelli testified, however, that Walker was on the porch, not the steps, and she did not see a threat necessitating discharging her firearm. (Purcelli Dep. at 75, 77, 90.) Both Walker and Will testified that Walker never left the porch. (Walker Dep. at 28, 46–47; JT Tr. 179.) Walker testified that his back was turned, heading back into the house, when the officers shot him. (Walker Dep. at 48–49, 51.)

Thus, even assuming the officer had probable cause to believe Walker had committed a crime involving threatened infliction of serious physical harm, there are questions of material fact as to whether Walker was armed when he exited the residence, whether he was making aggressive movements towards his mother and son or was retreating back into the house, and whether the officers warned Walker to "drop the gun" before discharging their firearms.

Furthermore, the actions of the police officers that led to the shooting are also relevant in determining the reasonableness of the officers' actions. *Brown v. Blanchard*, 31 F. Supp. 3d 1003, 1010 (E.D. Wis. 2014), *aff'd sub nom. Williams v. Indiana State Police Dep't*, 797 F.3d 468 (7th Cir. 2015). "An officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct." *Id.* In this case, a reasonable jury could conclude that the officers unreasonably created the encounter that led to the use of deadly force against Walker. The officers knew that Walker had weapons in the house and was having a psychotic episode. (JT Tr. at 170–71; Purcelli Dep. at 20–25.) The officers also knew that Walker had allegedly threatened to

17

kill Will. (JT Tr. 168.) Despite this knowledge, the officers concocted a plan in which the alleged victim, Will, lured Walker out of the house and to her car to retrieve Ambien. (Boll Dep. at 29.) While the officers were positioned on both sides of the house (*id.*), the officers do not testify that an officer was stationed with Will. If it was the officers' purpose to keep Will safe from the man who was allegedly threatening to kill her, then having her alone in her vehicle requesting the allegedly unstable Walker come over to her was arguably a risky idea.

And when Walker ultimately leaves the house and allegedly begins walking towards Will, the officers testify that it was this allegedly aggressive movement towards Will and his son, coupled with their belief he was armed, that necessitated the use of deadly force. (Gonzalez Dep. at 83; Boll Dep. at 85; Clifford Dep. at 94.) But again, it was the officers' plan for Will to lure Walker out of the house to begin with, under the guise of him retrieving Ambien from her. A reasonable jury could conclude that it was the officers who unreasonably created the situation that put Will and Walker's son in danger, thus necessitating, in their minds, the use of deadly force.

In sum, these disputes of material fact preclude a finding of summary judgment in the defendants' favor as to Walker's excessive force claim. As such, the defendants' motion for summary judgment as to Count I is denied.

      2.    *Failure to Intervene Claim*

Walker alleges that Gonzalez, Boll, Purcelli, Mahay, and Clifford had a realistic opportunity to prevent the officers' use of excessive force against him and failed to intervene to prevent the violation of his constitutional rights. (Second Am. Compl. ¶¶ 55–65.)

An officer who is present and fails to intervene to prevent other law enforcement officers from infringing the constitutional rights of citizens is liable under § 1983 if that officer had reason to know: (1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; and the officer had a realistic opportunity to intervene to prevent the harm from occurring.

*Doxtator v. O'Brien*, 39 F.4th 852, 864 (7th Cir. 2022) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). An officer must know that a citizen's rights are being infringed, and he or she must have a "realistic opportunity" to intervene. *Id.* at 864–65. "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury could not possibly conclude otherwise." *Id.* at 865 (internal quotation and citation omitted).

Defendants argue that the officers did not have a reasonable opportunity to stop the shooting given the "tense, high pressure situation, and the immediacy in which the shots were fired," which took place in a matter of seconds. (Docket # 55 at 10.) But Walker's argument is not that defendants should have intervened to stop the shooting once bullets were fired; rather, officers should have intervened to prevent the other officers from unreasonably precipitating the need to use deadly force by intervening in the development of the plan to apprehend Walker. (Docket # 62 at 15.)

On the record before me, a reasonable jury could find that the officers had sufficient time to intervene to prevent the harm done to Walker and failed to do so. Again, the reasonableness of a seizure through use of deadly force is not limited to the precise moment when the officer fires his or her weapon—the actions of the officers that led to the shooting are relevant. *See Brown*, 31 F. Supp. 3d at 1010. The dispatch regarding Walker came in

around 1:04 a.m. (Gonzalez Dep. at 16–20.) The officers received the dispatch and arrived on scene shortly thereafter. (*Id.* at 21.) The officers then jointly devised and agreed to execute the plan to have Will lure Walker out of the home with the promise of Ambien. (Gonzalez Dep. at 34–36; Boll Dep. at 26–29; Mahay Dep. at 28–32; Clifford Dep. at 24–27; Purcelli Dep. at 33–41; JT Tr. 172–73.) It was not until 1:44 a.m. that the officers went to their assigned positions and Will was instructed to place the call to Walker, putting the plan into motion. (Gonzalez Dep. at 39, 44.) Officers were on scene for at least thirty minutes before the plan was put into action. Not one of the officers questioned whether it was wise to use Will, the alleged victim of violent threats, as bait to lure Walker, the alleged aggressor, out of the house and to her car with the promise of Ambien. The officers even gave Will an empty paper bag to give Walker, pretending it contained Ambien. (JT Tr. at 172.) Again, whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officers is generally an issue for the jury unless, considering all of the evidence, "a reasonable jury could not possibly conclude otherwise." *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997). As with Walker's excessive force claim, summary judgment is not warranted on Walker's corresponding failure to intervene claim due to disputes of material fact. Thus, summary judgment is denied as to Count II.

    *3.    Qualified Immunity*

    Defendants further argue that even if the officers' use of deadly force was not objectively reasonable such that Walker's Fourth Amendment rights were violated, Gonzalez, Boll, Mahay, and Clifford are still entitled to summary judgment because they are entitled to qualified immunity. (Docket # 55 at 11.) The doctrine of qualified immunity is an affirmative defense to allegations that a state official violated the constitutional rights

of a plaintiff. *Denius v. Dunlap*, 209 F.3d 944, 950 (7th Cir. 2000). The defense is available only to state officials who occupy positions with discretionary or policymaking authority, and it protects those individuals solely when they are acting in their official capacity. *Id.* "These officials are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* To evaluate a claim of qualified immunity, courts engage in a two-step analysis. *Id.* First, the court must determine whether the plaintiff's claim states a violation of his constitutional rights. *Id.* Then, the court must determine whether those rights were clearly established at the time the violation occurred. *Id.* If the rights were clearly established, the official may be liable for monetary damages and the suit proceeds to the next stage. *Id.* If the rights were not clearly established, then the official is immune from suit and the claim is dismissed. *Id.*

It is the plaintiff's burden to demonstrate the existence of a clearly established constitutional right. *Id.* A clearly established right is one:

> Where [t]he contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right. To determine whether a right is clearly established, we look first to controlling Supreme Court precedent and our own circuit decisions on the issue. Because there is an almost infinite variety of factual scenarios that may be brought into the courtroom, a plaintiff need not point to cases that are identical to the presently alleged constitutional violation. However, the contours of the right must have been established so that the unlawfulness of the defendant's conduct would have been apparent in light of existing law.

*Id.* (internal quotations and citations omitted). Defendants argue that Walker cannot show that his asserted constitutional right was clearly established so as to put the defendants on notice that their conduct was unlawful. (Docket # 55 at 12.) I disagree. It is clearly established that an officer may not use deadly force to seize a person who is not threatening

21

the safety of the officer or anyone else. *See Garner*, 471 U.S. at 9–12. And even under plaintiff's theory that the defendants unreasonably created the encounter that led to their perceived need to use deadly force, "it is clearly established that an officer who shoots a suspect in an effort to protect himself cannot escape liability if the danger he faced was created by his own unreasonable conduct." *Brown*, 31 F. Supp. 3d at 1012. Although neither party points to a case identifying the defendants' specific conduct in this case as unreasonable, I conclude that it would have been obvious to a reasonable officer in the defendants' positions that using a victim who was recently threatened with violence as bait to lure out the person who allegedly threatened her and who the officers believed to be armed unreasonably created a situation calling for the need to use deadly force. *See Hope v. Pelzer*, 536 U.S. 730, 741 (2002) (stating that "officials can still be on notice that their conduct violates established law even in novel factual circumstances"). Thus, defendants are not entitled to summary judgment based on qualified immunity.

### 4. Monell *Claim Against the City*

Finally, Walker sues the City of Milwaukee under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), alleging the City failed to properly train its officers with respect to encountering situations involving individuals suffering from mental illness and/or experiencing a crisis situation. (Docket # 62 at 18.) Under *Monell*, a local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents under a theory of *respondeat superior*; rather, it is when "execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694. Under certain circumstances, a municipality's failure to train its

22

officers can amount to a municipal policy and form the basis for liability under § 1983.

*Brown*, 31 F. Supp. 3d at 1013. The *Brown* court found that:

> A municipality will be held liable under a failure-to-train theory only when the inadequacy in training amounts to deliberate indifference to the rights of the individuals with whom the officers come into contact. This may arise in either of two circumstances. First, a municipality acts with deliberate indifference when, in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the deficiency exhibits deliberate indifference on the part of municipal policymakers. Alternatively, a court may find deliberate indifference when a repeated pattern of constitutional violations makes the need for further training . . . plainly obvious to the city policymakers. Besides showing that the failure to train constitutes deliberate indifference, the plaintiff must demonstrate a causal connection between the inadequate training and his or her injury.

*Id.* at 1013–14 (internal quotations and citations omitted).

Defendants' argument that they are entitled to summary judgment on Walker's *Monell* claim is woefully underdeveloped. Beyond stating that there "are no facts for which a reasonable jury could infer that the City has a policy, pattern or practice of such conduct" and that "Walker's own independent experience is insufficient to establish liability under *Monell*," (Docket # 55 at 13–14), the defendants make no specific arguments.

Walker, on the other hand, argues that the City failed to properly train its police officers with respect to mental health crisis response and intervention and interacting with persons having mental health crises. (Docket # 62 at 19.) The City does not dispute that prior to and during the relevant time period, encountering individuals who are suffering from mental illness and/or experiencing a crisis situation was a recurring situation that MPD officers faced. (Plaintiff's Proposed Findings of Fact ("PPFOF" ¶ 41, Docket # 61 and Defs.' Resp to PPFOF ("Defs.' Resp.") ¶ 41, Docket # 64.) Boll testified that officers

23

requested a Crisis Intervention Officer, or a "CIT," to respond to Walker's residence the morning of April 6, 2014. (Boll Dep. at 13.) Boll testified that a CIT typically deals with people that are going through a crisis, "just not in their correct state of mind, so they have had special training on how to deal with those people." (*Id.* at 14.) Purcelli was the CIT on scene that night. (Purcelli Dep. at 26.) Purcelli testified that CIT training included learning how to talk to people in a state of crisis, how to "de-escalate circumstances so that we can communicate with them and to keep them safe and us safe." (*Id.* at 90.) Purcelli could not remember when she was trained in CIT or how often she was required to go to trainings. (*Id.*)

On the record before me, a reasonable jury could find that the City inadequately trained officers to address individuals in a state of crisis and that the City's inadequacy in training amounted to deliberate indifference. As stated above, a "municipality acts with deliberate indifference when, 'in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,' that the deficiency exhibits deliberate indifference on the part of municipal policymakers." *Jenkins v. Bartlett*, 487 F.3d 482, 492 (7th Cir. 2007) (internal citation omitted). Again, while the officers recognized that Walker's alleged mental health crisis necessitated the need for a CIT, Purcelli, the assigned CIT for the encounter, never interacted with Walker. Even though Purcelli testified that part of her CIT training included de-escalating circumstances to keep everyone safe (Purcelli Dep. at 90), Purcelli did not even attempt to de-escalate the situation. When asked whether she ever considered calling Walker and speaking to him, Purcelli testified: "No. Based on the agitated call he made to his mother and the other people in the house. We did not want to put them at risk.

24

So the goal was to get them out of the house and keep them safe too. Or get him out of the house -- and get him out of the house and keep them in the house where they were safe." (*Id.* at 95.)

Further, despite Purcelli testifying that she had received training on "how to talk to people in that state of crisis. How to treat them. How to de-escalate circumstances so that we can communicate with them and to keep them safe and us safe" (*id.* at 90), the officers stationed her the farthest away from Walker's house (*id.* at 44). Purcelli was stationed across the street (*id.* at 44), some two to three hundred feet away (*id.* at 60), while Gonzalez was stationed approximately seventy-five to one hundred feet from Walker's porch (Gonzalez Dep. at 48), and Boll was stationed approximately fifty feet from the porch (Boll Dep. at 44). It is unclear why the CIT officer, trained to deal with individuals experiencing a crisis situation, was stationed the farthest away from the individual in crisis.

On this record, a reasonable jury could determinate that "in light of the duties assigned" to Purcelli, the need for more or different training was obvious. *See Jenkins*, 487 F.3d at 492. Further, a jury could find that the inadequacy was likely to result in the violation of constitutional rights. *See id.* Purcelli clearly understood that people going through mental health and/or crisis situations may be volatile enough to require de-escalation. Thus, a reasonable jury could find that failure to properly train CIT officers to de-escalate volatile situations is likely to lead to the violation of constitutional rights, such as the use of excessive force. For these reasons, the defendants' motion for summary judgment as to Count III is denied.

## CONCLUSION

While the parties agree that Joseph Walker was shot in the early morning hours of April 6, 2014 by officers of the MPD, the parties vastly dispute the circumstances leading to his shooting. Walker paints the picture of a happy individual, walking out on his porch only to encounter police tape and express a curiosity to his mother and son who were outside regarding what was happening in his neighborhood. After turning to return inside his home, police shot him in the back. Whereas the officers paint the picture of an angry man yelling and swearing at his mother and son about why the police were there, attempting to conceal a firearm, and then moving off the porch in the direction of his mother. In addition to these disputed, material facts leading to Walker's shooting, there is a question of whether the officers' plan to use Walker's mother as bait to lure Walker out of the house, after Walker had allegedly threatened her life, unreasonably created the situation necessitating the deadly force. And the officers on scene all signed off on this plan. Finally, a question of material fact exists as to whether the City is liable to Walker under *Monell*, and the officers are not entitled to qualified immunity.

For these reasons, the defendants' motion for summary judgment is denied.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment (Docket # 54) is **DENIED**. The clerk's office will contact the parties regarding scheduling this matter for jury trial.

26

Dated at Milwaukee, Wisconsin this 28th day of March, 2023.

BY THE COURT:

_____
NANCY JOSEPH
United States Magistrate Judge

27